Argued and submitted June 18, 2001; resubmitted en banc February 6, affirmed
May 8, 2002

In the Matter of the Compensation of
Terry G. Logsdon, Claimant.

Terry G. LOGSDON,
*Petitioner,*

*v.*

SAIF CORPORATION,
*Respondent.*

99-00431; A109321

45 P3d 990

Max Rae argued the cause and filed the briefs for petitioner.

Julene M. Quinn argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, Brewer, and Schuman, Judges.

LANDAU, J.

Wollheim, J., dissenting.

## LANDAU, J.

Claimant seeks review of an order of the Workers' Compensation Board (board), challenging the adequacy of the board's award of benefits and the failure of the board to permit him to engage in cross-examination of two physicians who provided medical opinions on reconsideration concerning the date that he became medically stationary. We affirm, writing only to address the board's failure to permit claimant to cross-examine the physicians.

The pertinent facts are not in dispute. Claimant compensably injured his right knee in 1981. He received an award of scheduled permanent disability. In 1994, while working for employer, claimant again injured his right knee. Employer accepted a claim for acute septic arthritis of the knee. The claim was closed with an additional award of scheduled permanent disability.

In 1996, claimant sought treatment for continued pain and swelling of the right knee. His treating physician, Dr. Schieber, recommended a total knee replacement and authorized time loss beginning May 30, 1996. Employer eventually accepted a claim for aggravation of the right knee condition.

In 1998, Schieber recommended pain management therapy. At the pain center, Dr. Ploss reported that, because testing suggested that claimant was using heroin, pain center treatment was not appropriate. Ploss opined that claimant became medically stationary as of May 11, 1998. Schieber agreed with Ploss as to the medically stationary date.

On August 19, 1998, employer closed the claim by a determination order awarding temporary disability from May 30, 1996 through May 11, 1998, and awarding additional scheduled permanent disability for the right knee. Claimant requested reconsideration, and the order on reconsideration increased the award of scheduled permanent disability.

Claimant requested a hearing. He sought to compel employer to schedule depositions of Schieber and Ploss concerning their opinions about his medically stationary date.

The administrative law judge (ALJ) denied the motion, reasoning that ORS 656.283(7) prohibits taking evidence that was not in the reconsideration record. On the merits, the ALJ ultimately reduced the award of scheduled permanent disability and upheld the award of temporary disability through May 11, 1998. The board adopted the ALJ's order.

On review, claimant asserts that the board erred in failing to remand the claim to permit him to cross-examine Schieber and Ploss concerning his medically stationary date. He argues that, under *Koskela v. Willamette Industries, Inc.,* 331 Or 362, 15 P3d 548 (2000), to the extent that ORS 656.283(7) precludes such cross-examination, the statute violates his rights to due process of law guaranteed by the Fourteenth Amendment to the federal constitution. Employer argues that, even under *Koskela,* cross-examination is required only when matters of credibility are at issue; in this case, the issue is simply one of "medical proof, not credibility."

■ ORS 656.283(7) provides that "[e]vidence on an issue regarding a notice of closure that was not submitted at the reconsideration * * * is not admissible at hearing[.]" In *Koskela,* the court held that the statute requires that evidence offered at hearings on orders on reconsideration must be limited to what was presented in writing at reconsideration or what arises out of the reconsideration order itself. 331 Or at 375. Thus, it is clear that the statute forecloses the cross-examination of experts at a hearing on an order on reconsideration on the issue of when claimant became medically stationary. The question remains whether the statute, in so doing, is constitutional.

In *Koskela,* the Supreme Court addressed a related issue of whether ORS 656.283(7) is constitutional to the extent that it foreclosed the claimant from obtaining an oral hearing on the denial of permanent total disability benefits. The court held that, in failing to provide for such an oral hearing, the statute violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Applying the familiar three-part analysis of *Mathews v. Eldridge,* 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976), the court held: (1) a claimant whose claim has been accepted

has a significant property interest in receiving permanent total disability benefits, *Koskela,* 331 Or at 378-79; (2) because a worker seeking permanent total disability benefits must establish willingness to work and reasonable efforts to find suitable employment, and because those elements "require judgment about the worker's credibility and veracity," the probable value of an oral hearing is substantial, *id.* at 381; and (3) requiring an oral hearing will not significantly impair the state's ability to resolve claim disputes efficiently, *id.* at 382.

■ Taking our cue from *Koskela,* we examine claimant's constitutional contentions in this case by applying the three-part analysis of *Mathews.* Indeed, because the facts in *Mathews* closely parallel those in this case, we examine the Supreme Court's opinion in some detail. At issue in *Mathews* was whether the Due Process Clause of the Fifth Amendment requires the federal government to provide an opportunity for an evidentiary hearing before terminating social security temporary disability benefit payments on the ground that the claimant's disability had ceased. The United States Supreme Court held that the constitution does not require such hearings. The Court held that determining the constitutional sufficiency of an administrative process involves a balancing of the individual and governmental interests that are affected. *Mathews,* 424 US at 334. That balancing requires consideration of three factors in particular:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* at 335.

Applying that analysis to the facts of that case, the Court first held that, while a claimant has a property interest in continued disability benefits generally, an interest in the

continued receipt of temporary disability benefits is not particularly great. *Id.* at 340-42. Among other things, the Court considered significant in its assessment of the claimant's interests that financial need does not necessarily determine eligibility for disability benefits, that the benefits are temporary in nature, and that other forms of government assistance become available when the termination of disability benefits causes substantial hardship. *Id.*

The Court next held that the risk of erroneous decisions and the probable value of additional procedural safeguards were limited at best. The Court noted that the determination of when a disability ceases is a medical decision that does not turn on the credibility of witnesses:

> "[A] medical assessment of the worker's physical or mental condition is required. This is a more sharply focused and easily documented decision than the typical determination of welfare entitlement. In the latter case, a wide variety of information may be deemed relevant, and issues of witness credibility and veracity are often critical to the decision making process. * * *

> "By contrast, the decision whether to discontinue disability benefits will turn, in most cases, upon 'routine, standard, and unbiased medical reports by physician specialists' concerning a subject whom they have personally examined. * * * To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."

*Id.* at 343 (citations and internal quotation marks omitted).

Finally, the Court held that requiring an evidentiary hearing in termination of disability cases would entail fiscal and administrative burdens far out of proportion to any benefits that might be obtained thereby. *Id.* at 347-49.

■■ We turn to this case, beginning with the nature of claimant's interest in the determination of his medically stationary date. The determination of that date, among other things, cuts off entitlement to temporary disability benefits

and requires a determination of the extent of permanent disability. Entitlement to temporary disability benefits certainly is a property interest protected by the Due Process Clause. *See Carr v. SAIF,* 65 Or App 110, 120-21, 670 P2d 1037 (1983) (claimant's interest in uninterrupted receipt of temporary disability benefits subject to due process protection). But, as in *Mathews,* the significance of that property interest is limited. *See Carr,* 65 Or App at 120 ("[A]lthough the interest of [a] claimant in temporary total disability benefits is significant, it is generally less than the interest of a recipient in *Mathews.*"). It is a temporary benefit that does not have an irrevocable impact on a worker's self-sufficiency and livelihood, as was the case, for example, in *Koskela.* 331 Or at 378-79.

■       Turning to the risk of erroneous decisions and the probable value of additional safeguards, we note that the disputed issue in this case is the date on which claimant's medical condition became stationary. That is precisely the same issue that was disputed in *Mathews.* As the Court noted in that case, the determination of when a claimant's disability ceases—or, in this case, when claimant became "medically stationary"—is generally determined by reference to routine, standard, and unbiased medical reports. Witness credibility and veracity are rarely involved. This case, therefore, stands in distinct contrast to *Koskela,* in which the court took pains to emphasize that its assessment of the risk of erroneous decisions largely turned on the worker's credibility concerning his or her willingness to work and reasonable efforts to find suitable employment. *Koskela,* 331 Or at 380 (due process requires an oral hearing "when, as here, the decisionmaker must resolve factual disputes involving credibility and veracity").

■       Claimant concedes that the factual question to be determined in this case closely resembles the question at issue in *Mathews* and that, in both cases, the decision turns on a review of medical records. He nevertheless insists that, at least in some cases, it may be important to determine whether the medical opinions were subject to undue influence by employers or insurers. As the Supreme Court noted in *Mathews,* however, even if credibility concerns arise in some cases, "procedural due process rules are shaped by the

risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." 424 US at 344.

■    Finally, we turn to the state's interest and the cost of added procedural safeguards. The state's interests include, among other things, the development of a complete record at an early stage in the process to promote a speedy and efficient remedy for workers seeking benefits. *Koskela*, 331 Or at 381. To require physicians to submit to additional discovery and to cross-examination at hearing would involve scheduling burdens and would consume time and resources of both the parties and the state. The extent of those incremental costs is debatable. As the Supreme Court observed in response to similar considerations in *Mathews*, however, "experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial." 424 US at 347.

Even assuming that the costs would be minimal, the fact remains that we must weigh even those minimal costs against the likely benefits that they would produce. *Mathews*, 424 US at 348; *Koskela*, 331 Or at 382. In this case, given the limited nature of claimant's interest, and given the fact that credibility and veracity simply are not germane to the disposition of most disputes concerning a claimant's medically stationary date, we conclude that the procedural safeguards that claimant demands simply are not constitutionally required.

The dissent contends that, in the foregoing analysis, we have failed to apply *Mathews* properly in each of its three parts. With respect, we are unpersuaded by the dissent's contentions.

The dissent first contends that, in concluding that claimant's interests in this case are less significant than those at issue in *Mathews*, we err. Quoting our decision in *Carr*, the dissent urges that the deprivation of temporary benefits is significant. 181 Or App at 328 (Wollheim, J., dissenting). The dissent's reliance on *Carr* is fine, as far as it goes. The dissent simply ends its quotation too quickly, neglecting to include our conclusion in that case that,

"although the interest of [a] claimant in temporary total disability benefits is significant, *it is generally less than the interest of a recipient in Mathews*." *Carr*, 65 Or App at 120 (emphasis added).

The dissent contends that we likewise err in evaluating the risk of erroneous decisions in failing to afford the right to cross-examine experts on the determination of a medically stationary date. The dissent makes the point by reciting the facts of this case and urging that claimant's search for the truth will be compromised if he cannot cross-examine employer's physicians. 181 Or App at 328-29 (Wollheim, J., dissenting). With respect, the dissent's observations about the record in this case are beside the point. As we have noted, *Mathews* admonishes us to determine what due process requires, not on the basis of the facts of a particular case, but rather by evaluating "the risk of error inherent in the truthfinding process as applied *to the generality of cases*." 424 US at 344 (emphasis added). Although it is not clear what is meant by "the generality of cases," it is clear that more is required than demonstrating risk of error in a single case. *Id.* Moreover, in *Mathews*, the Court expressly concluded that, because, in the generality of cases, the determination of the date a claimant's disability ceases is determined by reference to routine, standard, unbiased medical reports, the risk of error in relying on written reports is minimal. *Id.* The Court's conclusion directly controls ours as to the determination of precisely the same issue in this case.

Finally, the dissent contends that we err in evaluating the burden that would result in permitting cross-examination of medical experts on the determination of medically stationary dates. According to the dissent, any burden associated with permitting cross-examination or depositions would be minimal. 181 Or App at 330 (Wollheim, J., dissenting). The dissent, however, mischaracterizes the relevant inquiry. *Mathews* requires more than merely establishing the burden that would result from requiring the additional procedure; instead, it requires that we weigh that burden against any benefits that might be obtained, once again, in the generality of cases. 424 US at 347-49. The dissent neglects to explain—and we do not understand—how, even assuming that the burdens of permitting cross-examination

would be minimal, those burdens would be justified in light of the minimal benefits that might thereby be obtained in the generality of cases. *See Mathews*, 424 US at 344.

Affirmed.

**WOLLHEIM, J.,** dissenting.

This is an extent of disability case where one issue is when claimant became medically stationary. Claimant sought to compel the scheduling of depositions so that he could cross-examine the two physicians who provided expert opinions regarding the date claimant became medically stationary. The majority concludes that claimant does not have a constitutional right to cross-examine those physicians. Because I disagree with the majority's application of the *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976), three-part due process analysis, I respectfully dissent. I also believe that the majority's opinion is inconsistent with the Supreme Court's opinion in *Koskela v. Willamette Industries, Inc.*, 331 Or 362, 15 P3d 548 (2000).

The question is whether ORS 656.283(7), insofar as it forecloses the cross-examination of medical experts on the question of the medically stationary date at an extent of disability hearing, is constitutional.[1] The issue in *Koskela* was whether ORS 656.283(7) was unconstitutional because it foreclosed the claimant from testifying at hearing when the issue was whether the claimant was entitled to permanent total disability (PTD) benefits. The Supreme Court held that ORS 656.283(7) was unconstitutional insofar as it denied the claimant the right to testify at an extent of disability hearing concerning willingness to work and reasonable efforts to find suitable employment. Although the issue here is slightly different from the issue in *Koskela*, that analysis applies and controls the outcome here.

Although I agree that the three-part analysis from *Mathews* applies, as required by *Koskela*, I disagree with the majority's application of those factors. Those three factors are:

---

[1] As interpreted by the Supreme Court in *Koskela*, there is no statutory right to cross-examine a physician in an extent of disability hearing. 331 Or at 375.

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews*, 424 US at 335. I will address each factor in turn.

## Private Interest Affected

The majority states that the facts of this case "closely parallel" the facts in *Mathews*, 181 Or App at 321. I disagree. In *Mathews*, the private interest at stake was the timing of a hearing on Social Security disability benefit payments, not the benefits themselves. The issue in *Mathews* was whether a full evidentiary hearing had to be provided *before* the petitioner's benefits could be terminated. A full evidentiary hearing with the opportunity for testimony and cross-examination was available to the petitioner after his benefits were terminated. If the termination decision was overturned at the post-termination hearing, the benefits would still be paid. Thus, the interest involved was timing and avoiding an interruption of the receipt of the benefits pending a final administrative decision on the claim. Here, on the other hand, claimant's interest is in the benefits themselves.

In *Koskela*, the court determined that the claimant's interest in receiving PTD benefits was great. Here, the majority states that although claimant's entitlement to temporary disability payments is a property interest protected by the Due Process Clause, "the significance of that property interest is limited." 181 Or App at 323. The majority downplays the interest at issue by suggesting that because *temporary* benefits are involved, there is not an "irrevocable impact on a worker's self-sufficiency and livelihood, as was the case, for example, in *Koskela*." 181 Or App at 323. I disagree.

"[T]emporary total disability benefits are designed to provide a substitute for income lost due to a worker's temporary inability to otherwise provide for himself. Deprivation of compensation, even for a relatively brief period of time, and the resulting possible loss of ability to acquire essential

goods and services, may threaten the health and safety of the worker and his dependents."

*Carr v. SAIF*, 65 Or App 110, 121, 670 P2d 1037 (1983), *rev dismissed* 297 Or 83 (1984). Temporary benefits have just as strong an impact on a worker's self-sufficiency and livelihood as do permanent benefits. The property interest here is sufficiently strong that it should not be as summarily downplayed as the majority suggests.

### Risk of Erroneous Decisions

Under the second *Mathews* factor—the risk of erroneous decisions and the probable value of additional safeguards—the majority states that when a claimant becomes medically stationary

"is generally determined by reference to routine, standard, and unbiased medical reports. Witness credibility and veracity are rarely involved. This case, therefore, stands in distinct contrast to *Koskela*, in which the court took pains to emphasize that its assessment of the risk of erroneous decisions largely turned on the worker's credibility concerning his or her willingness to work and reasonable efforts to find suitable employment."

181 Or App at 323. ORS 656.005(17) defines medically stationary as "no further material improvement would reasonably be expected from medical treatment, or the passage of time." Whether a claimant is medically stationary, while based on medical evidence, is a legal conclusion. For example, in *Maarefi v. SAIF*, 69 Or App 527, 530-31, 686 P2d 1055 (1984), we rejected a physician's conclusion that the claimant was not medically stationary. We examined the physician's opinion to determine if it was consistent with the statutory definition and determined that the physician used a different definition of medically stationary. *See also Clarke v. SAIF*, 120 Or App 11, 852 P2d 208 (1993) (issue involving a dispute over the date the claimant became medically stationary.)

The record establishes that Dr. Schieber, the attending physician, referred claimant for pain management therapy. In May 1998, Dr. Ploss, the pain management physician, agreed that claimant could benefit from pain management therapy. However, as a condition of claimant's admission,

Ploss sought to rule out heroin abuse. Over the next few months, claimant gave three urine samples. The first sample was negative for opiates, but Ploss suspected it was a false negative because of a prescription drug claimant was taking. Claimant gave two more specimens, both of which came back indeterminate because the urine was so diluted that Ploss believed that claimant was consuming large amounts of water in an effort to "hide something." In *July 1998*, Ploss and Schieber decided not to pursue multi-disciplinary pain center treatment and declared that claimant had become medically stationary as of May 1998.

However, in *September 1998*, claimant again saw Schieber for chronic knee pain. A chart note from that visit states that

> "[claimant] would also like to reschedule pain clinic center referral. This is a complicated subject as patient has previously been denied due to concerns of urine doping while testing for drugs. *Will however try again as I feel patient has chance of getting some benefit from pain clinic.*" (Emphasis added.)

Claimant sought to depose Schieber and Ploss concerning their opinions that claimant was medically stationary in May 1998. The fundamental consideration that the majority fails to acknowledge is the key distinction between the facts of *Mathews* and the facts of this case. As explained earlier, in *Mathews*, the petitioner had the opportunity for a *full* evidentiary hearing *after* his benefits were terminated. Here, on the other hand, claimant has no similar right. Unlike the petitioner in *Mathews*, claimant's due process rights will never be satisfied if he is not given the opportunity to cross-examine the two physicians who provided expert opinions regarding the date he became medically stationary.

Our dispute resolution system is premised on the belief that the adversarial system will produce the "truth" and that cross-examination is the best method for discovering the "truth."

> "It may be that in more than one sense [cross-examination] takes the place in our system which torture occupied in the mediaeval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented

for the discovery of truth. However difficult it may be for the layman, the scientist, or the foreign jurist to appreciate this its wonderful power, there has probably never been a moment's doubt upon this point in the mind of a lawyer of experience. * * * [C]ross-examination, not trial by jury, is the great and permanent contribution of the Anglo-American system of law to improved methods of trial procedure."

John Henry Wigmore, 5 *Evidence in Trials at Common Law* § 1367, 32 (1979).

Claimant here is denied this fundamental tool for discovering the truth. In cases of denied compensability, both parties are entitled to cross-examine any physician. ORS 656.310(2). Fundamental fairness requires that a claimant have that same right in an extent of disability hearing. *See State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189-90, 796 P2d 1193 (1990) ("Fundamental fairness emphasizes factfinding procedures. The requirements of notice, adequate counsel, *confrontation, cross-examination*, and standards of proof flow from this emphasis."). (Emphasis added.)

## Government Interest and Fiscal and Administrative Burden

The final factor is the government's interest, including any burden that additional procedural requirements would entail. ORS 656.283 grants a claimant the right to request a hearing on any issue concerning compensation, including when the claimant became medically stationary. The issue becomes whether allowing cross-examination at such a hearing creates an undue burden on the state.

The burden to the state of allowing a medical expert to be deposed and cross-examined is minimal in comparison to the interest at stake. Under the administrative rules, the parties are responsible for scheduling the deposition of any expert witness. OAR 438-006-0055. The parties are responsible for the costs of any depositions. OAR 438-007-0005(3). The taking of depositions, rather than testimony at hearing, is the preferred method. OAR 438-005-0007(4). Further, a hearing will not be continued merely because a physician's schedule would not accommodate a deposition prior to the hearing. *Georgia-Pacific Corp. v. Kight*, 126 Or App 244, 868 P2d 36 (1994).

Administrative law judges (ALJs) are required to conduct an extent of disability hearing in a manner that achieves "substantial justice." ORS 656.283(7). ALJs have the experience required to conduct hearings that do not unduly burden the State of Oregon. The Supreme Court stated in *Koskela* that "[ALJs] are expert, neutral decision-makers who can control the extent and length of testimony and can work with the parties to limit the record to written submissions when doing so is appropriate." 331 Or at 382.

Finding the truth is the essential task at an extent of disability hearing. As previously quoted, Wigmore wrote that cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." Due process and fundamental fairness require that claimant not be denied this greatest legal engine. Claimant should be entitled to obtain depositions so as to allow him to cross-examine the medical experts.

For the reasons stated in this dissent and in my separate dissenting opinions in *Trujillo v. Pacific Safety Supply*, 181 Or App 302, 45 P3d 1017 (2002) (Wollheim, J., concurring in part and dissenting in part), and *Mount v. DCBS*, 181 Or App 458, 46 P3d 210 (2002) (Wollheim, J., dissenting), the majority wrongly concludes that claimant does not have a constitutional right to cross-examine witnesses at his extent of disability hearing.

I respectfully dissent.

Armstrong, J., joins in this dissent.